NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13285


COMMONWEALTH  vs.  CHAREE RAINEY.



Suffolk.      December 5, 2022. – April 6, 2023.

Present:  Gaziano, Lowy, Cypher, Kafker, Wendlandt, &
Georges, JJ.



Practice, Criminal, Probation, Revocation of probation, Hearsay.
Evidence, Wiretap, Hearsay.  Due Process of Law, Probation
revocation.  Global Positioning System Device.  Statute,
Construction.




Indictments found and returned in the Superior Court
Department on September 5, 2012.

A proceeding for revocation of probation was heard by
Michael D. Ricciuti, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.



Gail M. McKenna for the defendant.
Brooke Hartley, Assistant District Attorney, for the
Commonwealth.
Christopher P. Conniff & Michelle Mlacker, of New York,
Kacie Brinkman, of Illinois, Claudia Leis Bolgen, & Thanithia
Billings, for Massachusetts Association of Criminal Defense
Lawyers, amicus curiae, submitted a brief.
Nina L. Pomponio, Special Assistant Attorney General, &
Arthur J. Czugh for Massachusetts Probation Service, amicus
curiae, submitted a brief.

WENDLANDT, J.  While on probation for assault and battery, G. L. c. 265, § 13A, and for violating an abuse prevention order, G. L. c. 209A, § 7, the defendant, Charee Rainey, forcibly entered his then girlfriend's home over her objection and proceeded to assault her.  Responding to the subsequent domestic disturbance call, Boston police officers arrived at the victim's residence; one officer activated his body-worn camera before entering the premises.  The still-distraught victim reported the assault to the officers.  One officer recorded the victim's statement in writing; and the officer who was equipped with the body-worn camera was able to capture on the audio-visual video footage the victim's reporting of the events that had transpired, the state of her home within his plain view, and his own interview of the victim's two daughters.  The defendant, who had fled the apartment immediately following the assault, was not recorded.

On appeal, the defendant contends that the wiretap statute, G. L. c. 272, § 99, precluded the use of the body-worn camera footage at his probation violation proceeding, and that the recording violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  We disagree.  Further concluding that the Superior Court judge did not abuse his discretion in

concluding that the victim's statements were substantially reliable, and seeing no reason to doubt the judge's statement that his findings regarding the defendant's global positioning system (GPS) violations did not drive the decision to revoke probation, we affirm.[1]

1. Background. We recite the facts found by the judge, supplemented by our independent review of the video footage from the body-worn camera. See Commonwealth v. Yusuf, 488 Mass. 379, 381 (2021), quoting Commonwealth v. Clarke, 461 Mass. 336, 341 (2012) ("we are in the same position as the . . . judge in viewing the videotape").

a. Facts. Relevant to the present appeal, in 2013, the defendant was convicted and sentenced to three years of probation for assault and battery, G. L. c. 265, § 13A, to run concurrently with three years of probation for violation of an abuse prevention order, G. L. c. 209A, § 7.[2] The conditions of

_____

[1] We acknowledge the amicus briefs submitted by the Massachusetts Association of Criminal Defense Lawyers and the Massachusetts Probation Service.

[2] The defendant also was convicted and ultimately sentenced to five years and one day in State prison for assault and battery by means of a deadly weapon resulting in serious bodily injury, G. L. c. 265, § 15A (c), to run concurrently with five years of probation for another violation of an abuse prevention order, G. L. c. 209A, § 7. Relevant to the appeal, the defendant's term of incarceration was to be followed by the aforementioned three years of probation. The defendant was also found guilty of malicious destruction of property, G. L. c. 266,

probation included that he obey all laws, have no contact with the 2013 victim,[3] and wear a GPS device to ensure he stayed away from the 2013 victim.[4]

In December 2019, while the defendant was serving probation for these crimes, Boston police Officers Richard Santiago and Sparks Flantey responded to a call of an "intimate partner in domestic violence" at the home of the defendant's then girlfriend (victim).  Before entering the victim's apartment, Santiago activated his body-worn camera.[5]

The victim allowed the officers to enter her apartment. Her voice was shaky, and she was sniffling and distraught.  The victim's two young daughters were home.

---

§ 127, but no sentence for this crime is noted in the docket; on appeal, the defendant raises no issue relating thereto.

[3] The 2013 victim is not the same victim as in the present case.

[4] A GPS device "is an electronic monitor designed to report continuously the probationer's current location."  Commonwealth v. Thissell, 457 Mass. 191, 191 n.1 (2010), quoting Commonwealth v. Raposo, 453 Mass. 739, 740 (2009).

[5] "As the name suggests, a body-worn camera is a small camera that is clipped to a police officer's uniform, on his chest or possibly to head-gear, such as glasses or a head-mount."  Blitz, American Constitution Society for Law and Policy, Police Body-Worn Cameras:  Evidentiary Benefits and Privacy Threats, at 3 (May 2015).  "It can then record video of the area in front of it and audio of the surrounding environment.  The camera is either activated by the officer wearing it or automatically triggered by a sound, movement, or other stimulus."  Id.  See St. 2020, c. 253, § 104 (a) (defining "Body-worn camera").

The victim proceeded to report the events that had transpired that evening. She explained that, approximately two hours earlier, while she was asleep, the defendant had taken her apartment keys, the keys to her then-inoperable truck, and the keys to her rental car. After she awakened, she ordered a pizza for pickup and called the defendant to inquire as to the location of the rental car so that she could retrieve the pizza order. They argued, and she told him not to return to the apartment. She placed a sofa couch in front of the door to block his entrance.

In contravention of her request, the defendant returned to the apartment and attempted to open the door; the victim asked him not to enter and warned that she would call the police. Nevertheless, the defendant forced the door open, moving the couch forward and injuring the victim's toe.

In the ensuing struggle, he pushed the victim's neck and chest, scratching her chest. The victim yelled for her older daughter to call the police and to go to the upstairs neighbor; in response, the defendant covered the victim's mouth and then slapped the telephone from the daughter's hand.

The defendant pushed the victim to the ground and used his legs to push her away. He then took some personal belongings and fled the apartment in the rental vehicle, also taking with him the apartment keys.

The victim repeated parts of this account of the assault several times in response to officers' questions, consistently explaining the timeline of events and the cause of her injuries.[6] As she spoke, Flantey took written notes of her report, and she spelled the names of those involved.  Santiago told her that detectives would come to photograph her injuries, and that he would preserve the information she had reported in his police report.

Santiago testified that he saw the victim's chest injuries. He also spoke with the older daughter, who confirmed that the defendant had covered the victim's mouth and slapped the telephone from the daughter's hand.[7]

Emergency medical technicians (EMTs) and detectives arrived at the scene; the EMTs attended to the victim's injuries.

The officers asked the victim to contact the car rental company to obtain information to assist in finding the defendant and the rental vehicle.  While the victim was on the telephone with the car rental company, Santiago announced that he was

---

[6] Shortly after the police officers arrived, the victim stepped outside to retrieve the pizza she had ordered, now for delivery, for her children.

[7] The victim's younger daughter explained that she had covered her face during the altercation and did not see anything.

recording and asked whether that was acceptable. No verbal response is recorded on the video footage.[8]

Thereafter, the victim and the older daughter went with the EMTs to the hospital.[9] Officers stayed in the apartment until the lock on the apartment door was changed to impede the defendant's reentry.

b. Procedural history. Based in large part on the report of the domestic disturbance, the probation department issued a notice of surrender, alleging new criminal conduct and failure to pay fines.[10] The probation department subsequently amended the notice to add allegations of failures to comply with GPS requirements in May, June, and July of 2020.

At the final surrender hearing, Santiago testified and the body-worn camera footage was admitted over the defendant's

---

[8] Throughout the recording, a periodic beeping can be heard, but it is not clear from the video footage whether the noise was audible to others.

[9] The victim's younger daughter was left in the care of her neighbor.

[10] The alleged crimes for the probation violations were assault and battery on a household or family member, G. L. c. 265, § 13M (a); threat to commit a crime, G. L. c. 275, § 2; assault and battery, G. L. c. 265, § 13A (a); malicious destruction of property worth under $1,200, G. L. c. 266, § 127; and breaking and entering at nighttime to commit a felony, G. L. c. 266, § 16.

The defendant also was charged in a parallel criminal case stemming from this incident; each count was ultimately disposed of in a nolle prosequi.

objection that the statements in the video footage were hearsay. The probation department also submitted an e-mail message detailing the defendant's alleged GPS violations; there was no objection to the admission of these GPS documents.

Determining that the statements captured on the video footage were substantially reliable by applying the factors set forth in Commonwealth v. Hartfield, 474 Mass. 474 (2016), discussed infra, the judge found all but one of the new charges, destruction of property, proved by a preponderance of the evidence. He did not consider, as a basis for his decision, whether the defendant failed to pay fines; and, while the judge found that the probation department had proved the GPS violations, he explained, "candidly, that [did not] drive the result here."

The judge revoked the defendant's probation and sentenced him to two years in a house of correction on the assault and battery conviction, followed by one year of probation for the violation of the abuse protection order.[11] Explaining his rationale for revoking probation, the judge stated that "[d]omestic abuse is serious" and the video footage was

---

[11] The transcript and the written findings indicate that the one year of probation was for both violations of the abuse protection order; however, the defendant should have already served his sentence on one violation concurrently with his incarcerated sentence. See note 2, supra.

"telling" -- "this defendant was given a chance to avoid a harsh sentence, and he had lots of opportunities to avoid it, and went right back to the activity that got him in trouble in the first place."[12]  The defendant appealed, and we ordered the case transferred to this court sua sponte.

2.  Discussion.  a.  Wiretap statute.  On appeal, the defendant first maintains that the wiretap statute, G. L. c. 272, § 99, precluded use of the body-worn camera footage in connection with the probation violation proceeding.  Subsection 99 C of the statute makes it a crime to "willfully commit[] an interception . . . of any . . . oral communication," punishable by, inter alia, a fine of up to $10,000, imprisonment for five years in State prison, or both.  G. L. c. 272, § 99 C 1.  The term "interception" is defined as "to secretly hear[ or] secretly record . . . the contents of any . . . oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication."  G. L. c. 272, § 99 B 4.  An "intercepting device" includes "any device or apparatus which is

_____

[12] In his written findings, the judge set forth further reasons for the disposition, including the circumstances of the crime for which probation was ordered and the crime's impact on any person or the community, the nature of the probation violation, the defendant's record of prior probation violations, the opportunity for rehabilitation under community supervision, and the recommendation of the probation officer.

capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid."  G. L. c. 272, § 99 B 3.  A body-worn camera is an intercepting device.

i.  Exclusionary rule.  The defendant's contention that the body-worn camera footage was improperly admitted and used at his probation violation proceeding faces several procedural hurdles.  To begin, the exclusionary rule does not generally apply to probation violation proceedings.  See Commonwealth v. Olsen, 405 Mass. 491, 494 (1989); Commonwealth v. Vincente, 405 Mass. 278, 280 (1989).  This is because "[t]he purpose of probation rather than immediate execution of a term of imprisonment 'in large part is to enable the [convicted] person to get on his feet, to become law abiding and to lead a useful and upright life under the fostering influence of the probation officer.'"  Commonwealth v. Wilcox, 446 Mass. 61, 64 (2006), quoting Mariano v. Judge of Dist. Court of Cent. Berkshire, 243 Mass. 90, 93 (1922).  See Morrissey v. Brewer, 408 U.S. 471, 477 (1972) ("Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed").  "Evidence that a probationer is not complying with the conditions of probation may indicate that he or she has not been rehabilitated

and continues to pose a threat to the public."[13] <u>Vincente</u>, <u>supra</u>.  For this reason, "it is extremely important that <u>all</u> <u>reliable</u> evidence shedding light on the probationer's conduct be available during probation [violation] proceedings" (citation omitted).  <u>Id</u>.

Indeed, the ability to review all reliable evidence is a common interest shared by both the State and the probationer.  See <u>Commonwealth</u> v. <u>Kelsey</u>, 464 Mass. 315, 321 (2013) ("the interest in an accurate evaluation [of all the reliable evidence] -- the only interest shared by both parties -- is of central concern in determining the scope of a probationer's due process rights").  See also <u>Gagnon</u> v. <u>Scarpelli</u>, 411 U.S. 778, 785 (1973) ("Both the probationer . . . and the State have interests in the accurate finding of fact and the informed use of discretion -- the probationer . . . to insure that his liberty is not unjustifiably taken away and the State to make certain that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community").

---

[13] A probationer has already been convicted of a crime beyond a reasonable doubt and enjoys "only . . . conditional liberty . . . dependent on observance of special [probation] restrictions."  <u>Olsen</u>, 405 Mass. at 493, quoting <u>Morrissey</u>, 408 U.S. at 480.

By contrast, "the risk that illegally obtained evidence might be excluded from [probation violation] proceedings is likely to have only a marginal additional deterrent effect on illegal police misconduct."  Vincente, 405 Mass. at 280.  Accordingly, we have determined that the exclusionary rule should not apply to such proceedings.  Id.[14]

Thus, if the remedy the defendant seeks is available, its basis must be found in the wiretap statute itself.[15]  Tellingly, the defendant cites no such remedial provision.

While the wiretap statute provides remedies for violations of the statute, none of those remedies applies to individuals in the defendant's position.  For example, the statute allows "a defendant in a criminal trial" to move to suppress the contents

---

[14] The defendant does not suggest that there was "egregious police conduct" or "conduct that 'shock[s] the conscience'" in this case (citation omitted).  Olsen, 405 Mass at 496.

[15] The defendant mentions in passing that Santiago may have violated the Boston police department's policy regarding the use of body-worn cameras.  Neither the defendant nor the Commonwealth addresses whether any such violation would preclude the use of the video footage in connection with a probation violation proceeding; accordingly, we do not address the issue. We note that the policy permits officers to use a body-worn camera without notice when "an immediate threat to the officer's life or safety or the life or safety of any other person makes [body-worn camera] notification dangerous."  See Boston Police Department Rule 405, Body Worn Camera Policy § 2.5 (June 3, 2019).  Here, at least when Santiago initially activated the body-worn camera, he did not know whether the defendant was present or posed an ongoing threat; moreover, Santiago stayed in the victim's apartment until the lock was changed to prevent the defendant's reentry.

of intercepted wires or communications.  G. L. c. 272, § 99 P.
Because a probation violation proceeding is not a criminal
trial, see Commonwealth v. Costa, 490 Mass. 118, 123 (2022),
quoting Commonwealth v. Durling, 407 Mass. 108, 112 (1990)
("Revocation hearings are not part of a criminal prosecution"),
this remedy is not available.

The statute also allows an "aggrieved person" a private
right of action against any person who intercepts, discloses, or
uses an unauthorized interception.  G. L. c. 272, § 99 Q.  An
aggrieved person is defined as "any individual who was a party
to an intercepted wire or oral communication or who was named in
a warrant authorizing the interception, or who would otherwise
have standing to complain that his personal or property interest
or privacy was invaded in the course of an interception."  G. L.
c. 272, § 99 B 6.  The defendant rightly does not claim to be an
aggrieved person; while the victim reported the assault by the
defendant, he himself was not a party featured in the body-worn
camera footage.[16]  Compare Curtatone v. Barstool Sports, Inc.,
487 Mass. 655, 658-659 (2021) (action brought by aggrieved
person, alleging he was secretly recorded).

---

[16] The defendant also was not named in a warrant authorizing
the body-worn camera recording; there was none.  Nor does the
defendant contend that his personal or property interest or
privacy was invaded such that these interests would preclude the
recording.  Additionally, a probation violation proceeding is
not a civil action for damages.  G. L. c. 272, § 99 Q.

These provisions, which carve out specific remedies for certain individuals, belie the defendant's assertion that the statute entitles him to the remedy he seeks. See Fascione v. CAN Ins. Cos., 435 Mass. 88, 94 (2001), quoting 3 N.J. Singer, Sutherland Statutory Construction § 57.18, at 46 (5th ed. 1992) ("[W]here a statute creates a new right and prescribes the remedy for its enforcement, the remedy prescribed is exclusive"). See also Skawski v. Greenfield Investors Prop. Dev. LLC, 473 Mass. 580, 588 (2016), quoting Bank of Am., N.A. v. Rosa, 466 Mass. 613, 619 (2013) (applying "the statutory maxim, 'expressio unius est exclusio alterius,' meaning 'the expression of one thing in a statute is an implied exclusion of other things not included in the statute'").

Indeed, given the rights available under the statute, the defendant's reliance on the statute in connection with the probation violation proceeding is at best questionable. Notably, each of the cases the defendant cites involves individuals who were themselves recorded.[17] See, e.g.,

---

[17] Nor is this the type of case that might trigger the doctrine of third-party standing, which may be available to a defendant in a criminal trial and further requires a showing of egregious misconduct. See Commonwealth v. Santiago, 470 Mass. 574, 578 (2015), quoting Commonwealth v. Scardamaglia, 410 Mass. 375, 380 (1991) ("in a case where the police engage in 'distinctly egregious' conduct that constitutes a significant violation of a third party's art. 14 rights in an effort to obtain evidence against a defendant, it may be appropriate to

Commonwealth v. Mitchell, 468 Mass. 417, 421, 428 (2014) (concerning suppression of recording of defendant's voice in telephone call); Commonwealth v. Tavares, 459 Mass. 289, 302-303 (2011) (suppression of defendant's statements, secretly recorded by informant); Commonwealth v. Gordon, 422 Mass. 816, 833 (1996) (declining to suppress videotape of defendant during booking procedure); Commonwealth v. Jackson, 370 Mass. 502, 503 (1976) (refusing to suppress taped conversations in which defendant was participant); Commonwealth v. Ashley, 82 Mass. App. Ct. 748, 749, 762 (2012), cert. denied, 571 U.S. 838 (2013) (affirming denial of motion to suppress defendant's recorded statements during police station interrogation).

ii.  Use of body-worn camera to record victim's report. Passing over these substantial hurdles, the defendant asserts that the plain language of the wiretap statute shows that the Legislature intended to preclude the use of the body-worn camera footage in a probation violation proceeding because the statute criminalizes, inter alia, the secret recording of oral communications.  G. L. c. 272, § 99 C 1.  In the defendant's

---

permit the defendant to rely on the standing of the third party to challenge the police conduct").  See also Commonwealth v. McCarthy, 484 Mass. 493, 511 (2020), quoting Santiago, supra ("We also repeatedly have declined to adopt target standing under art. 14, but have left open the possibility of applying the doctrine in cases of 'distinctly egregious police conduct'").

view, Santiago committed a crime under the wiretap statute, potentially subjecting Santiago to incarceration in State prison, even though he was responding to the call that a crime had transpired, the victim consented to his entry into her home, and she knew that, at the least,[18] officers were creating a written record of her report of the details of the domestic violence committed by the defendant that evening; indeed, she helped the responding officers correctly spell the names of her daughters for the written record. Moreover, because the wiretap statute also makes it a crime to willfully disclose or use a prohibited interception, G. L. c. 272, § 99 C 3, the defendant contends that the prosecutor, the probation officer, and the Superior Court judge also are subject to criminal penalties.[19]

---

[18] The record is devoid of information sufficient to determine whether the victim heard Santiago announce that he was recording or whether the body-worn camera operated in a manner that would have notified the victim that she was being recorded. Accord Commonwealth v. Morganti, 455 Mass. 388, 395, 400-401 (2009) (recording of defendant's telephone call in police interview room not illegal interception under wiretap statute because he was told police officers intended to videotape interview, and thus "the defendant knew that his words in the interview room were subject to being recorded"); Commonwealth v. Rivera, 445 Mass. 119, 134 (2005) (Cowin, J., concurring) (no interception where video cameras were in plain view and "defendant can be presumed to have had actual awareness of the existence of the devices and that he was under surveillance").

[19] He also contends that his counsel's failure to object to the use or disclosure of the video footage was ineffective assistance of counsel.

A. Standard of review. "We review questions of statutory interpretation de novo." Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021). "Our primary goal in interpreting a statute is to effectuate the intent of the Legislature." Id., quoting Casseus v. Eastern Bus Co., 478 Mass. 786, 795 (2018). "[O]ur analysis begins with 'the "principal source of insight into legislative intent"' -- the plain language of the statute." Patel v. 7-Eleven, Inc., 489 Mass. 356, 362 (2022), quoting Tze-Kit Mui v Massachusetts Port Auth., 478 Mass. 710, 712 (2018). We have explained:

> "The general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (emphasis added).

Pesa, supra, quoting Commissioner of Revenue v. Dupee, 423 Mass. 617, 620 (1996). See HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 332 (2022), quoting Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006) (same).

"When the meaning of a statute is brought into question, a court properly should read other sections and should construe them together." City Elec. Supply Co. v. Arch Ins. Co., 481 Mass. 784, 790 (2019), quoting LeClair v. Norwell, 430 Mass. 328, 333 (1999). See Plymouth Retirement Bd. v. Contributory

Retirement Appeals Bd., 483 Mass. 600, 605 (2019) ("Beyond plain language, [c]ourts must look to the statutory scheme as a whole . . . so as to produce an internal consistency within the statute . . . . Even clear statutory language is not read in isolation" [quotations omitted]); Commonwealth v. Morgan, 476 Mass. 768, 777 (2017) ("The plain language of the statute, read as a whole, provides the primary insight into that intent. . . . We do not confine our interpretation to the words of a single section").

Where the Legislature has set forth its intent in the form of a codified preamble, we consider the preamble as part of the whole statute, to the extent that it does not conflict with the more specific statutory provisions. See Brookline v. Commissioner of the Dep't of Envtl. Quality Eng'g, 398 Mass. 404, 412 (1986) ("general preambles . . . do not take precedence over specific provisions"). In construing the wiretap statute, in particular, we have turned repeatedly to the statute's preamble to inform our analysis. See, e.g., Curtatone, 487 Mass. at 659-660; Tavares, 459 Mass. at 295 & n.5; Commonwealth v. Ennis, 439 Mass. 64, 68 (2003); Gordon, 422 Mass. at 833; Commonwealth v. Thorpe, 384 Mass. 271, 279 (1981), cert. denied, 454 U.S. 1147 (1982).

B.  Statutory framework.  Admittedly, subsection 99 C of the wiretap statute could be construed literally as the

defendant suggests, subjecting police officers, probation officers, prosecutors, and the judge to severe penalties.  See G. L. c. 272, § 99 C 1 (crime to "willfully commit[] an interception . . . of any . . . oral communication"); G. L. c. 272, § 99 C 3 (criminalizing willful disclosure or use of interception).  However, "in the absence of more specific statutory language to that effect . . . , we are unwilling to attribute that intention to the Legislature."  Gordon, 422 Mass. at 832-833.

"[O]ur respect for the Legislature's considered judgment dictates that we interpret the statute to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation."  Osborne-Trussell v. Children's Hosp. Corp., 488 Mass. 248, 254 (2021), quoting Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 620 (2013).  See Patel, 489 Mass. at 364, quoting Whitman v. American Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("the Legislature 'does not, one might say, hide elephants in mouseholes'"); Commonwealth v. Diggs, 475 Mass. 79, 82 (2016), quoting Champigny v. Commonwealth, 422 Mass. 249, 251 (1996) ("Because we assume generally that the Legislature intends to act reasonably, '[w]e will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable'").

Our decision in Gordon is instructive.  There, the defendant contended that the wiretap statute precluded law enforcement officials from making an audio-visual recording of the defendant's booking procedure at the police station. Gordon, 422 Mass. at 832.  While we acknowledged that subsection 99 C of the statute could "be read literally as making unlawful the audiotaping of booking procedures without the knowledge of the persons being booked," we were unwilling to attribute such an intent to the Legislature in the absence of more specific language.  Id. at 832-833.  Instead, we read subsection 99 C in the context of the statute as a whole, including its codified preamble.  See id. at 833.  See also Plymouth Retirement Bd., 483 Mass. at 605.

We concluded that the "legislative focus [of the wiretap statute, as set forth in the statute's preamble,[20]] was on the protection of privacy rights and the deterrence of interference

---

[20] In pertinent part, the preamble codified the Legislature's finding that "organized crime" existed in the Commonwealth and was "a grave danger to the public welfare and safety."  G. L. c. 272, § 99 A.  The Legislature concluded that "[n]ormal investigative procedures" were "not effective in the investigation of illegal acts committed by organized crime" and that "law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities."  Id.  The preamble also codified the Legislature's recognition that "the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth."  Id.

therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool." Gordon, supra at 833. The Legislature, we observed, "[did] not appear to have in mind the recording of purely administrative bookings steps following an individual's arrest." Id. Accordingly, we declined to read the statute as barring the admission of the recording of the booking procedure in the defendant's criminal trial. Id.

Similarly, nothing in the wiretap statute as a whole, including its codified preamble, evinces an intent to prohibit recording a victim's volunteered report of a crime where, as here, the victim was aware that officers already were memorializing her report in writing, much less an intent to criminalize the use of such a recording at a probation violation proceeding. The body-worn camera was not used as an investigative tool to secretly eavesdrop on an otherwise private conversation;[21] it captured the victim's voluntary statement to police officers, which she knew was being memorialized by them

---

[21] The Commonwealth incorrectly suggests that the wiretap statute protects only communications as to which the speaker maintains a reasonable expectation of privacy, and thus that its protections are coextensive with the Fourth Amendment and art. 14. Compare Jackson, 370 Mass. at 506 ("we would render meaningless the Legislature's careful choice of words if we were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy"), with Commonwealth v. DeJesus, 489 Mass. 292, 295 (2022) (defendant may challenge search or seizure under art. 14 and Fourth Amendment only if defendant has reasonable expectation of privacy).

in writing.  The resulting video footage was not a clandestine recording precluded by the wiretap statute; rather, it merely preserved the statement (albeit through an alternative, electronic medium) that the victim voluntarily gave to law enforcement officers and which she understood was being recorded by them by means of paper and pen.[22]  See Ashley, 82 Mass. App. Ct. at 762 (declining to construe wiretap statute to criminalize use of camera in police station interrogation room to record defendant's volunteered statement to officers when officers "repeatedly expressed their intention to get it 'down on paper' and memorialize the interview").  Accord Commonwealth v. Hyde, 434 Mass. 594, 602 & n.9 (2001) (contrasting "clandestine recording" prohibited by wiretap statute with "good practice" of electronic recording of police interrogations based on presumption "that, when police interrogations are electronically

---

[22] The wiretap statute does not define the term "record." Accordingly, we concluded that "record" as used in the wiretap statute should be given its plain and ordinary meaning to "mean, 'to set down in writing' or 'to cause (sound, visual images) to be transferred to and registered on something by electronic means in such a way that the thing so transferred and registered can . . . be subsequently reproduced'" (emphasis added). Commonwealth v. Moody, 466 Mass. 196, 209 (2013), quoting Webster's Third New International Dictionary 1898 (1971).  See Moody, supra ("secretly record" as used in wiretap statute "includes the interception of text messages by viewing and transcribing them for use at a later date" [emphasis added]).

recorded, the suspect is aware that the interrogation is being preserved").[23]

C.  Legislative history.  The legislative history also does not support the defendant's construction.  See HSBC Bank USA, N.A., 490 Mass. at 332-333, quoting Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 435 (2002) ("Where the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative history . . . , for assistance in our interpretation'").  Instead, the history confirms our conclusion in Gordon, 422 Mass. at 833, that the Legislature was concerned principally with the investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously on conversations.

The relevant provisions of the statute trace their history to 1964 when the Legislature established a special commission to study "the laws relative to eavesdropping and the use of

---

[23] The defendant mistakenly relies on Hyde to support his contention that the plain meaning of the wiretap statute criminalizes the police officer's recording in this case.  In Hyde, 434 Mass. at 599-600, we construed the statute to prohibit the secret recording of police officers performing their public duties.  As the dissent in Hyde noted, such a literal construction was unnecessary, id. at 607 (Marshall, C.J., dissenting); and the literal construction led to an unconstitutional result.  See Project Veritas Action Fund v. Rollins, 982 F.3d 813, 844 (1st Cir. 2020), cert. denied, 142 S. Ct. 560 (2021) ("Section 99 violates the First Amendment in criminalizing the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces").

electronic recording devices . . . with a view to strengthening the laws relative to eavesdropping and the use of wire tapping recording devices" [emphasis added].  St. 1964, c. 82.  See Tavares, 459 Mass. at 294-295, quoting Commonwealth v. Vitello, 367 Mass. 224, 231 (1975) ("the Legislature appointed a special commission in 1964 to investigate electronic eavesdropping and 'ensure that unjustified and overly broad intrusions on rights of privacy are avoided'").  In April 1967, the commission issued an interim report, which focused on various types of "eavesdropping devices," namely "bug[s]."  1967 Senate Doc. No. 1198, at 3.  These "subminiature transmitter[s]" could eavesdrop on unknowing speakers and "transmit a very clear signal at least [seven] blocks in downtown Boston and [could] pick up a whisper at [twenty] feet."  Id.  See Hyde, 434 Mass. at 608 n.7 (Marshall, C.J., dissenting) (devices were not mere audiotape recorders, but rather "sophisticated inventions of then-recent origin that could be concealed in telephones or walls").  See also Curtatone, 487 Mass. at 659, quoting Tavares, supra ("Here, the legislative intent, apparent both in the legislative history of the act and the act itself, concerns limiting 'electronic eavesdropping' . . . .  The act was adopted in 1968 in direct response to 'the commercial availability of sophisticated surveillance devices and the ease with which they facilitated surreptitious recording of private citizens' by private

individuals and law enforcement alike"); Commonwealth v. Moody, 466 Mass. 196, 201 (2013), quoting Tavares, supra (same); Ennis, 439 Mass. at 68 & nn.9, 10, quoting 1968 Sen. Doc. No. 1132, at 6 ("the Legislature sought to prohibit all 'secret' electronic eavesdropping by 'private individuals'" because "the commission heard testimony that newly developed inventions, 'eavesdropping devices' and 'bugs,' could be easily concealed and used to monitor private conversations secretly and continuously. . . . The commission feared that '[a] person with a minimal education in electronics [could] easily install these commercially available devices for purposes of illegally intercepting wire or oral communications'"). The commission recommended enacting new legislation to clarify the "eavesdropping" statute, G. L. c. 272, § 99. 1967 Senate Doc. No. 1198, at 14-15.

The following year, the commission proposed a new version of G. L. c. 272, § 99. See 1968 Senate Doc. No. 1132, at 14 (Appendix A). The commission recommended that the Commonwealth "strictly forbid electronic eavesdropping or wiretapping by members of the public," id. at 6, and permit "eavesdropping and wiretapping by law enforcement officials . . . in order to effectively combat the menace of organized crime but only if such wiretapping and eavesdropping . . . be strictly supervised by the judicial branch of the government," id. at 7-8. The commission's proposed bill defined "interception" as secretly

hearing or recording a communication without the prior consent of all parties -- a marked departure from the one-party consent exception contained in the former statute, which had required only the consent of either the sender or the receiver. Compare 1968 Senate Doc. No. 1132, at 14, with St. 1959, c. 449, § 1. See Thorpe, 384 Mass. at 280 n.7 (as proposed, "[l]aw enforcement officers were required, without exception, to obtain warrants before conducting any surveillance" [emphasis added]).

The statute, as amended, reflects most of the recommendations of the commission, with the addition of a preamble. See St. 1968, c. 738, § 1. The statute, however, retained the one-party consent exception for law enforcement officers, but only under narrow circumstances; specifically, it authorized these officers "to conduct warrantless electronic surveillance" in connection with "investigation" of organized crime when they were a party to the communication or had been given authority by a party (emphasis added). Thorpe, 384 Mass. at 280 n.7, citing G. L. c. 272, § 99 B 4, 7. The Legislature's focus was the use of devices, like bugs, for clandestine or surreptitious eavesdropping; the Legislature did not appear to have in mind law enforcement officers' use of devices to record a crime victim's voluntary reporting of a crime under circumstances where, as here, the victim understood her statement was being preserved by them. In sum, the legislative

history (like the statutory framework, including the preamble) is devoid of anything to support the defendant's proposed construction, and accordingly, we reject it.

b. <u>Constitutional analysis</u>.  The defendant's contention that the recording violated the State and Federal Constitutions requires little attention.  Where, as here,

> "the officer was lawfully present in the home and the body-worn camera captured only the areas and items in the plain view of the officer as he or she traversed the home, in a manner consistent with the reasons for the officer's lawful presence, the recording is not a search in the constitutional sense and does not violate the Fourth Amendment or art. 14."

<u>Yusuf</u>, 488 Mass. at 390.

c. <u>Hearsay</u>.  The defendant next maintains that the judge erred in relying on the video footage and the GPS evidence, which he contends were not substantially reliable hearsay.

i. <u>Standard of review</u>.  "[R]evocation proceedings must be flexible in nature" and "all reliable evidence should be considered."  <u>Durling</u>, 407 Mass. at 114.  "[W]hen hearsay is offered as the only evidence of the alleged violation, the indicia of reliability must be substantial . . . because the probationer's interest in cross-examining the actual source (and hence testing its reliability) is greater when the hearsay is the only evidence offered."  <u>Id</u>. at 118.

To determine whether hearsay has substantial indicia of reliability, a judge may consider, inter alia,

"(1) whether the evidence is based on personal knowledge or direct observation; (2) whether the evidence, if based on direct observation, was recorded close in time to the events in question; (3) the level of factual detail; (4) whether the statements are internally consistent; (5) whether the evidence is corroborated by information from other sources; (6) whether the declarant was disinterested when the statements were made; and (7) whether the statements were made under circumstances that support their veracity."

Hartfield, 474 Mass. at 484. "There is no requirement that hearsay satisfy all the above criteria to be trustworthy and reliable." Costa, 490 Mass. at 124, quoting Commonwealth v. Patton, 458 Mass. 119, 133 (2010). "[W]here a judge relies on hearsay evidence in finding a violation of probation, the judge should set forth in writing or on the record why the judge found the hearsay evidence to be [substantially] reliable." Hartfield, supra at 485. See Matter of a Minor, 484 Mass. 295, 308 (2020) ("For probation [violation] hearings, in which substantially reliable hearsay . . . is admissible, we have required judges to state explicitly the reasons supporting the reliability of any hearsay they rely upon"). We review a judge's determination that hearsay is substantially reliable, like other evidentiary decisions, under an abuse of discretion standard. See, e.g., N.E. Physical Therapy Plus, Inc. v. Liberty Mut. Ins. Co., 466 Mass. 358, 363 (2013) (trial judge's ruling on applicability of exception to hearsay rule reviewed for abuse of discretion).

ii. **The recorded statements**. The judge found the victim's statements in the body-worn camera footage to be substantially reliable, noting that the statements were made based on personal knowledge,[24] factually detailed, internally consistent, and corroborated (e.g., the victim's injuries were visible on the video footage and were observed by Santiago). The judge determined that, while the victim was not disinterested, her daughter may have been, and the daughter confirmed some of the events. And he found that the circumstances of the statements, particularly the emotional distress of the victim, lent them credibility. Balancing the factors, the judge found that the statements were substantially reliable; none of the defendant's arguments to the contrary suggests that the judge abused his discretion.

iii. **The GPS evidence**. Based on the GPS records, which were introduced without objection, the judge also found that the

---

[24] Contrary to the defendant's argument that the statements were made two hours after the events, it is clear from the video footage that, while the defendant took the victim's keys two hours prior to his assaulting the victim, he did not return to the apartment at that time; instead, the altercation occurred shortly before the statements were made. See Yusuf, 488 Mass. at 380-381, citing Clarke, 461 Mass. at 341 (independent review of video footage); Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018), quoting Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015) (reviewing court may supplement judge's subsidiary findings with evidence from documentary evidence unless that would cause it to "reach a conclusion of law that is contrary to that of [the] . . . judge").

defendant violated the GPS conditions of his probation.  On appeal, the defendant argues that, because the GPS records were unreliable, the judge's reliance on the records requires the revocation to be vacated.  Seeing no reason to doubt the judge's statement that the GPS violations did not "drive the result," we disagree.

3.  <u>Conclusion</u>.  The order revoking probation and imposing sentence are affirmed.

<u>So ordered</u>.