# COMMONWEALTH *vs.* CORY A. MOODY
## (and four companion cases[1]).

Berkshire. April 1, 2013. - August 9, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Eavesdropping. Evidence,* Wiretap. *Constitutional Law,* Federal preemption. *Federal Preemption. Practice, Criminal,* Warrant. *Search and Seizure,* Warrant. *Cellular Telephone.*

Discussion of the Federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, Pub. L. No. 90-351, 82 Stat. 211 (1968), which prohibits the wilful interception of any wire or oral communication unless such interception is authorized by a warrant issued by a Federal or State judge of competent jurisdiction. [199-201]

Discussion of the Massachusetts wiretap statute, G. L. c. 272, § 99, modeled on the Federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, Pub. L. No. 90-351, 82 Stat. 211 (1968). [201-202]

Discussion of the Electronic Communications Privacy Act, amending the Federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, Pub. L. No. 90-351, 82 Stat. 211 (1968), by creating a new category of protected communication, i.e., electronic communication; amending the definition of "wire communication"; and amending the definition of "intercept." [202-203]

This court concluded that a Superior Court judge is permitted under the Massachusetts wiretap statute, G. L. c. 272, § 99, to issue warrants authorizing the interception of cellular telephone calls and text messages, where the existing language of the Massachusetts wiretap statute is broad enough to protect all forms of cellular telephone calls that utilize wire, cable, or other like connections (even if the use of such connections is only in switching stations), such that it is as protective as the amended Federal wiretap statute [204-207]; and where, in light of the broad statutory definitions of "wire communication" and "interception," the Massachusetts wiretap statute provides protection for the electronic transmission of text messages consistent with the protections currently provided by the Federal wiretap statute [207-209].

INDICTMENTS found and returned in the Superior Court Department on December 17, 2010.

[1] Three against Cory A. Moody, and one against Devin Newman.

Pretrial motions to suppress evidence were heard by *Daniel A. Ford*, J., and a question of law was reported by him to the Appeals Court.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Timothy M. Farris* for Devin Newman.

*Edmund R. St. John, III*, for Cory A. Moody.

*Joseph A. Pieropan*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Dana A. Curhan & Matthew R. Segal* for American Civil Liberties Union of Massachusetts.

*Martha Coakley*, Attorney General, *& Jessica V. Barnett & Patrick Hanley*, Assistant Attorneys General, for the Attorney General.

*Michael J. Iacopino*, of New Hampshire, *Veronica J. White, Benjamin Leatherman, Peter Ettenberg, Frank Camera, Peter Clifford, & Max D. Stern*, for Jorge Areiza & others.

CORDY, J. The defendants, Cory A. Moody and Devin Newman, were separately indicted for various violations of the Controlled Substances Act, G. L. c. 94C, stemming from their alleged involvement in an organized group engaged in drug trafficking in Berkshire County. In particular, Moody was indicted for one count of trafficking in cocaine, G. L. c. 94C, § 32E (*b*); one count of distribution of cocaine, G. L. c. 94C, § 32A (*c*); and two counts of conspiracy to violate the drug laws, G. L. c. 94C, § 40.[2] For his part, Newman was indicted for one count of conspiracy to traffic in cocaine, G. L. c. 94C, § 40.

Prior to trial, the defendants filed separate motions to suppress the fruits of several search warrants issued under the Massachusetts wiretap statute, G. L. c. 272, § 99, which authorized the interception of calls and text messages sent over their cellular telephones. The defendants argued that the interception of these forms of communication was beyond the scope of authority provided under G. L. c. 272, § 99, and, thus, preempted by

---

[2]Specifically, the Commonwealth alleges Moody conspired to distribute cocaine, G. L. c. 94C, § 32A (*c*), and to traffic in one hundred grams or more of cocaine, G. L. c. 94C, § 32E (*b*) (4).

the cognate provisions of the Federal wiretap statute, 18 U.S.C.
§§ 2510 et seq. (2006 & Supp. V 2011). In a consolidated deci-
sion, the motion judge denied the defendants' motions as to
their cellular telephone calls, but granted their motions as to the
interception of their text messages. The judge then reported the
following question to the Appeals Court pursuant to Mass. R.
Crim. P. 34, as amended, 442 Mass. 1501 (2004): "Does G. L.
c. 272, § 99 authorize a Superior Court Judge to issue a war-
rant permitting state law enforcement officers to intercept cel-
lular telephone calls and text messages?"[3] We transferred the
case to this court on our own motion.

Based on the language of the Massachusetts wiretap statute
and the legislative history surrounding the Federal wiretap statute,
we conclude that a Superior Court judge possesses the authority
under the Massachusetts wiretap statute to issue warrants permit-
ting the interception of cellular telephone calls and text messages.[4]

*Background.* In October, 2010, the Commonwealth applied
for and was granted warrants authorizing the interception of
"oral and wire communications" made on cellular telephones
belonging to or being utilized by the defendants.[5] The warrants
were sought in connection with an investigation into the defend-
ants' participation in an "ongoing conspiracy to commit the
crimes of distribution of controlled substances, trafficking in
controlled substances and conspiracy to commit the specified

---

[3]Because the question reported to the Appeals Court was limited to the
Superior Court's authority under G. L. c. 272, § 99, to issue warrants authoriz-
ing the interception of cellular telephone calls and text messages, we decline
to address whether the affidavit in support of the warrant applications set forth
sufficient facts to establish a nexus to "organized crime." See *Commonwealth
v. Tavares*, 459 Mass. 289, 297 (2001) (designated offense under G. L. c. 272,
§ 99, must be "committed in connection with organized crime").

[4]We acknowledge the amicus briefs of the Attorney General, the American
Civil Liberties Union of Massachusetts, and Jorge Areiza and others.

[5]The initial warrant application sought wiretaps on five cellular telephone
numbers, two of which belonged to Moody and three of which belonged to
Moody's alleged cohort, Charles Best, who is not a defendant in this case.
Shortly after the initial warrants issued, the Commonwealth sought additional
warrants authorizing the interception of "oral and wire communications" on
three "newly discovered" telephone numbers belonging to Moody and Best,
all of which were granted. Thus, in total, the Commonwealth received permis-
sion to monitor eight different cellular telephone numbers. Devin Newman is
alleged to have used two or more of these cellular telephones.

narcotics offenses." According to the affidavit accompanying the warrant applications, the wiretaps were needed to reveal specific information about the "nature, extent and methods of operation of the illicit business." Following the issuance of the warrants, the police monitored the defendants' cellular telephone calls and text messages for approximately one week. The contents of these cellular telephone calls and text messages were the subject matter of the defendants' motions to suppress.

*Discussion.* The defendants argue that, although the Federal wiretap statute, which was amended in 1986, both protects cellular telephone calls and text messages as well as authorizes their interception upon the issuance of a warrant, the Massachusetts wiretap statute, which has not been similarly amended since its adoption in 1968, does neither. For this reason, the defendants argue that the warrants at issue were illegal because they authorized the interception of communications beyond the scope of the Massachusetts wiretap statute and, further, that the Massachusetts wiretap statute is preempted because it provides less protection than its Federal counterpart. Consequently, the defendants suggest that the only permissible way for law enforcement authorities to intercept cellular telephone calls and text messages is under the Federal wiretap statute. We disagree.

1. *History of Federal and Massachusetts wiretap statutes.* a. *Federal wiretap statute — Title III.* In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, Pub. L. No. 90-351, 82 Stat. 211 (1968) (Title III). The purpose of Title III was to protect wire and oral communications by "defin[ing] on a uniform basis, the circumstances and conditions under which the interception of wire and oral communications may be authorized, [and by] prohibit[ing] any unauthorized interception of such communications." *Id.* at § 801(b), 82 Stat. at 211. This purpose reflected a balance between Congress's recognition that the "interception of [wire and oral] communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice," *id.* at § 801(c), 82 Stat. at 211, and the overriding need "[t]o safeguard the privacy of innocent persons," *id.* at § 801(d), 82 Stat. at 211.

To effectuate this balance, Title III prohibited the wilful

"intercept[ion]" of any "wire or oral communication," *id.* at § 802, 82 Stat. at 213, unless a Federal or State judge of "competent jurisdiction" authorized such interception through the issuance of a warrant. *Id.* at § 802, 82 Stat. at 216, 218-219.[6] As pertinent to this case, the term "wire communication" was defined to mean *"any communication* made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or like connection between the point of origin and the point of reception" (emphasis added).[7] *Id.* at § 802, 82 Stat. at 212. The term "intercept" was defined to mean "the aural acquisition of the contents of any wire . . . communication through the use of any electronic, mechanical, or other device." *Id.* Thus, the definition of "intercept" was confined to the interception of the human voice by the human ear. See *United States* v. *New York Tel. Co.,* 434 U.S. 159, 166-167 (1977) (pen registers not subject to Title III because they "do not accomplish the 'aural acquisition' of anything"); S. Rep. No. 541, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3566; H.R. Rep. No. 647, 99th Cong., 2d Sess., at 17-18 (1986).

In "enacting Title III [Congress] intended to occupy [and thus preempt] the field of wiretapping and electronic surveillance, except as that statute specifically permits concurrent State regulation." *Commonwealth* v. *Vitello,* 367 Mass. 224, 245 (1975) (*Vitello*). As for concurrent state regulation, Title III permitted States to "promulgate legislation authorizing certain designated officials to apply to State court judges . . . for wiretap orders to be utilized in enforcement of statutes designated under the State criminal law." *Vitello, supra* at 246. See Pub. L. 90-351, § 802, 82 Stat. 211, 217, codified at 18 U.S.C. § 2516(2) (2006 & Supp. III 2009). Thus, while Congress en-

---

[6]In addition to the "warrant exception," the Federal wiretap statute in its current form excludes other types of conduct from the general prohibition against wilful interception of wire and oral communication. See 18 U.S.C. § 2511(2) (2006 & Supp. III 2009). However, none of these exceptions is relevant in the present case.

[7]"[O]ral communication" was defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." Pub. L. No. 90-351, § 802, 82 Stat. 211, 212 (1968).

deavored to "define on a uniform basis, the circumstances and conditions under which the interception of wire and oral communications may be authorized," *id.* at § 801(b), 82 Stat. at 211, it allowed for "concurrent State regulation subject, at the minimum, to the requirements of the Federal regulation." *Vitello, supra,* citing Pub. L. 90-351, § 801(b), 82 Stat. 211, 217-218. See S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2187.

b. *Massachusetts wiretap statute — G. L. c. 272, § 99.* Shortly after Congress enacted Title III, the Legislature rewrote the Massachusetts wiretap statute and modeled it on Title III. See G. L. c. 272, § 99, as appearing in St. 1968, c. 738, § 1. See also *Commonwealth* v. *Ennis,* 439 Mass. 64, 68 n.9 (2003). Like Congress, the Legislature was "[a]larmed by the commercial availability of sophisticated surveillance devices and the ease with which they facilitated surreptitious recording of private citizens," *Commonwealth* v. *Tavares,* 459 Mass. 289, 294-295 (2011), and wanted to "ensure that unjustified and overly broad intrusions on rights of privacy [were] avoided." *Id.* at 295, quoting *Vitello, supra* at 231. At the same time, however, the Legislature was keenly aware that in order to combat "the increasing activities of organized crime [that] constitute a grave danger to the public welfare and safety . . . . law enforcement officials must be permitted to use modern methods of electronic surveillance . . . when investigating these organized criminal activities." G. L. c. 272, § 99 A. See *Commonwealth* v. *Tavares, supra* at 295.

To this end, in wording nearly identical to Title III, the Massachusetts wiretap statute prohibits the wilful "interception . . . of any wire or oral communication," G. L. c. 272, § 99 C 1, unless a judge of "competent jurisdiction" authorizes such interception through the issuance of a warrant. G. L. c. 272, § 99 D 2 d & H 2. Similarly, the statute also defined the term "wire communication" to mean "*any communication* made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception" (emphasis added). G. L. c. 272, § 99 B 1. In words different than those employed in Title III, however, the term "intercep-

tion" was defined to mean "to secretly hear [or] secretly record . . . the contents of any wire . . . communication through the use of any intercepting device." G. L. c. 272, § 99 B 4.

c. *Electronic Communications Privacy Act.* In 1986, Congress amended Title III by enacting the Electronic Communications Privacy Act of 1986 (ECPA), Pub. L. 99-508, 100 Stat. 1848 (1986), codified as amended in scattered sections of 18 U.S.C. Congress's stated purpose in passing the ECPA was "to protect against the unauthorized interception of electronic communications [by] updat[ing] and clarify[ing] Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. 541, 99th Cong., 2nd Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3555.

To accomplish this goal, Congress amended Title III in several important respects. First, it built on the protection already afforded wire and oral communications by creating a new category of protected communication called "electronic communication." Pub. L. 99-508, § 101(c)(1)(A), 100 Stat. 1848, 1851-1852, codified, as amended, at 18 U.S.C. § 2511(1)(a) (2006). Congress defined "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include . . . any wire or oral communication." *Id.* at § 101(a)(6)(B), 100 Stat. at 1848-1849, codified, as amended, at 18 U.S.C. § 2510(12) (2006). As pertains to the issue before us, the definition of "electronic communication" under Federal law plainly includes the transmission of text messages.

Second, Congress amended the definition of "wire communication" by substituting the words, "any aural transfer," for the words, "any communication," thereby explicitly limiting wire communications to those involving the human voice.[8] Con-

---

[8]The Electronic Communications Privacy Act of 1986 (ECPA), Pub. L. 99-508, § 101(a)(6)(C), 100 Stat. 1848, 1849 (1986), codified, as amended, at 18 U.S.C. § 2510(18) (1986), defines "aural transfer" to mean "a transfer containing the human voice at any point between and including the point of origin and the point of reception." Thus, the term may be understood as any communication initiated orally, e.g., by human voice, and received or acquired aurally, e.g., by human ear.

gress also added language clarifying that a "wire communication" is one that is made "in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (*including the use of such connection in a switching station*)" (added language emphasized). *Id.* at § 101(a)(1)(B), 100 Stat. at 1848, codified, as amended, at 18 U.S.C. § 2510(1) (2006). Thus, Congress made clear that calls from one cellular telephone to another are included within the definition of "wire communication" even when the "wire, cable, or other like connection" occurs only briefly in a switching station.[9]

Third, Congress amended the term "intercept" to mean "the aural *or other* acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" (emphasis added), *id.* at § 101(a)(3)(A), 100 Stat. at 1848, codified, as amended, at 18 U.S.C. § 2510(4) (2006), thereby ensuring that it included the acquisition of not only the human voice, but also other forms of communication.

Finally, the ECPA established a two-year grace period for States, essentially delaying Federal preemption with respect to the amendments and allowing States time to amend their wiretap statutes to the extent necessary to meet or exceed the level of protection provided to electronic communications under Title III.[10] *Id.* at § 111(b), 100 Stat. at 1859. The Legislature never amended G. L. c. 272, § 99.[11]

---

[9]"When a caller dials a number on a cellular telephone, a transceiver sends signals over the air on a radio frequency to a cell site. From there the signal travels over phone lines or a microwave to a computerized mobile telephone switching office ('MTSO') or station. The MTSO automatically and inaudibly switches the conversation from one base station and one frequency to another as the portable telephone, typically in a motor vehicle, moves from cell to cell." S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3563.

[10]Specifically, it provided: "Any interception pursuant to [a State wiretap statute] which would be valid and lawful without regard to the amendments made by this title shall be valid and lawful notwithstanding such amendments if such interception occurs during the period beginning on the date such amendments take effect and ending on . . . the date two years after [October 21, 1986]." Pub. L. No. 99-508, § 111(b), 100 Stat. at 1859.

[11]The Massachusetts wiretap statute has been amended three times since 1968; these amendments are not relevant to the present case. See St. 1986, c. 557, § 199; St. 1993, c. 432, § 13; St. 1998, c. 163, §§ 7-8.

2. *Authority to issue warrants authorizing interception of cellular telephone calls and text messages under Massachusetts wiretap statute.* a. *Validity of the wiretap warrants notwithstanding preemption.* Before proceeding to the preemption analysis, it is necessary to address a point not raised by any of the parties; that is, whether a State warrant that complied with the requirements of Federal law would be valid notwithstanding Federal preemption. In *Vitello, supra* at 245, we considered whether other provisions of the Massachusetts wiretap statute were preempted by Title III.[12] In our decision, we explicitly noted that the "preemption analysis . . . should be distinguished from the issue of the validity of a warrant issued pursuant to a State statute found in certain particulars to be in conflict with Title III and therefore partially preempted." *Vitello, supra* at 248. Based on our interpretation of 18 U.S.C. § 2516(2) (1970), which authorizes concurrent State legislation, we concluded that a warrant issued pursuant to a State wiretap statute is not automatically invalidated simply because a particular provision of the State statute is preempted by Title III. *Vitello, supra* at 248-249. Rather, as long as a State statute contains a valid provision authorizing applications for wiretap orders, "[a]ny warrant issued under such a limited State authorization would be measured against the specific provisions of Title III." *Id.* at 248. Because we concluded in *Vitello*, that the authorization provisions of the Massachusetts wiretap statute were valid and severable, even if other provisions of the statute were preempted by Title III, and thus inoperable, "warrants issued [under the statute] would be valid as long as . . . the warrants themselves meet the Federal standards." *Id.* at 249.

This is significant for our purposes. Assuming that the Legislature's failure to amend the Massachusetts wiretap statute

---

[12]In particular, the defendant in *Commonwealth* v. *Vitello*, 367 Mass. 224, 251 (1975), argued that Title III preempted provisions of the Massachusetts wiretap statute relating to "(1) the authority of assistant district attorneys to apply for wiretap orders; (2) the requirement that the wiretap order be proved necessary in that other investigative procedures have been tried and failed; (3) requirements that the order identify the agency authorized to intercept, contain statements providing that it be executed as soon as practicable, and be conducted in such a way as to minimize the interception of communications; (4) the provision for recording, sealing of tapes, and the serving of notice and inventory; and (5) designated offenses for which a wiretap order may be obtained."

in a manner consistent with the 1986 amendments to Title III results in preemption, based on our decision in *Vitello, supra,* the warrants issued under the Massachusetts statute do not automatically fail. Rather, if the warrants authorizing the interception of the defendants' cellular telephone calls and text messages themselves would satisfy the standards set forth in the Federal wiretap statute, they would remain valid.[13,14] However, as we noted in *Vitello, supra,* "we need not rest our decision on this basis alone because we find . . . that the Massachusetts statute, in the several particulars challenged by the defendants, is not repugnant to the provisions of the Federal act and is accordingly not preempted."

b. *Interception of cellular telephone calls.* We begin by considering whether the definition of "wire communication" under the Massachusetts wiretap statute includes, and thus protects, cellular telephone calls. Prior to 1986, the definition of "wire communication" was identical under Title III and the Massachusetts wiretap statute. Compare Pub. L. 90-351, § 802, 82 Stat. 211, 212 (1968), with G. L. c. 272, § 99 B 1. For this reason, there can be no doubt that prior to the ECPA, the meaning of the term "wire communication" as used in the Massachusetts wiretap statute, was *at least* as inclusive, and thus protective, as its Federal counterpart. See *O'Sullivan* v. *NYNEX Corp.,* 426 Mass. 261, 264 n.5 (1997). See also *Vitello, supra* at 251 (in substance, requirements of Massachusetts statute are same as Title III). Consequently, in ascertaining the scope of the term "wire communication" under the Massachusetts statute, it is instructive to review the scope of that term as it appears in the 1968 Federal wiretap statute.

---

[13]At oral argument the defendants conceded that the warrants issued by the Superior Court judge "probably" would have satisfied the standards of the Federal wiretap statute.

[14]For this reason, even assuming that the State wiretap statute is preempted by the Federal wiretap statute, which it is not, the defendant's argument — that the only way to procure a warrant authorizing interception of his cellular telephone calls and text messages would be by seeking assistance from a Federal prosecutor under Federal law — is unavailing. In such a hypothetical situation, because the Legislature has enacted a valid authorization provision, the substance of the Federal wiretap statute would be read into the State wiretap statute, thereby allowing State prosecutors to continue to seek, and State judges to continue to authorize, warrants under the State wiretap statute.

According to the 1986 Senate Report accompanying the ECPA, "Congress, in passing the 1968 wiretap law already made willful monitoring of [cellular] telephone calls illegal when at least part of the conversation is carried by wire." See S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3561. The corresponding 1986 House Report is in agreement: "The availability of [cellular telephone] technology poses a troubling conflict between the technology of surveillance and new techniques of communicating using radio. Interception of cellular calls is illegal under current federal law." H.R. Rep. No. 99-647, 99th Cong., 2d Sess., at 20 (1986). Read in conjunction, the two reports suggest that cellular telephone calls traveling in any part over a standard telephone wire or "land line" were covered by the definition of "wire communication" under the 1968 Federal wiretap statute. What was left in some doubt by the 1968 statute was whether a call from one cellular telephone to another, which traveled entirely by radio signals, except for its passage through a switching station, was protected. Cf. *Bartnicki* v. *Vopper*, 532 U.S. 514, 524 (2001) ("As enacted in 1968, Title III did not apply to the monitoring of radio transmissions").

The ECPA eliminated any such doubt by amending the definition of "wire communication" to add the language, "including the use of such connection in a switching station." Pub. L. No. 99-508, § 101(a)(1)(B), 100 Stat. 1848, 1848 (1986), In doing so, Congress "[made] clear that cellular communications — whether they are between two cellular telephones or between a cellular telephone and a 'land line' telephone — are included in the definition of 'wire communication[]' and are covered by [Title III]." S. Rep. No. 541, 99th Cong., 2nd Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3565.[15] Thus, the ECPA did not mark the beginning of Title III's coverage of cellular telephone calls;

---

[15]Because a cellular telephone call involves the transmission of the human voice, the fact that the ECPA narrowed the definition of "wire communication" by replacing "any communication" with "any *aural* transfer" (emphasis added), has no effect on our analysis. Additionally, we reject the defendants' argument that the conversion of an analogue voice signal to a digital signal renders the resulting communication an "electronic communication," rather than a "wire communication." See S. Rep. No. 541, 99th Cong., 2nd Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3566.

rather, it served only to clarify that all forms of cellular telephone calls were protected under Title III.

As we have noted, the Legislature did not amend the Massachusetts wiretap statute after enactment of the ECPA. As a result, the scope of the term "wire communication" under the State statute still retains the language of the 1968 Federal wiretap statute, which could be interpreted as not protecting cellular telephone calls that travel primarily by radio signals. However, this does not mean that the Massachusetts statute is less protective than Title III — it only means that on its face the Massachusetts wiretap statute is less clear than its Federal counterpart. "The fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading the [statute] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases . . . ." *Dillon* v. *Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 315 (2000).

We have no doubt that, in enacting the Massachusetts wiretap statute, the Legislature intended to protect all calls that to any extent or degree traveled "by the aid of wire, cable, or other like connection." The reality that cellular telephone technology has drastically reduced the need for such connections does not alter the "intrinsic intended scope" that we read the statute to preserve. In sum, we conclude that the existing language of the Massachusetts wiretap statute is broad enough to protect all forms of cellular telephone calls that utilize wire, cable, or other like connections, even if the use of such connections is only in switching stations. Thus, the Massachusetts wiretap statute is as protective as the amended Federal wiretap statute.

c. *Interception of text messages.* We turn next to whether text messages are protected under the Massachusetts wiretap statute. As discussed, in 1986, Congress purposefully narrowed the definition of "wire communication" under Title III to include only "aural transfer[s]." In doing so, Congress intentionally excluded non-oral electronic transmissions, such as text messages, from Title III's definition of "wire communication" and placed them within the newly defined category of "electronic communication." Because the Legislature has never undertaken to amend G. L. c. 272, § 99, to conform to the ECPA, the defend-

ants argue that the Massachusetts wiretap statute does not protect text messages and, thus, is less protective than Title III.

Once again, however, the defendants' argument runs head long into the legislative history of the ECPA, which explicitly recognized the possibility that "state laws [might] not need [to] be changed to accommodate revisions on interceptions of wire or oral communications." H. Rep. No. 99-647, 99th Cong., 2d Sess., at 62 (1986). If the Massachusetts wiretap statute and its definition of "wire communication" provide at least as much protection for text messages as the now amended Title III does, the statute would not be preempted. Given our recognition that, "in certain respects the Massachusetts statute [even before the 1986 amendment of Title III] is more restrictive than Title III," *Vitello, supra* at 251 n.15, we are persuaded that the existing statutory language under G. L. c. 272, § 99 B, is broad enough to cover non-oral electronic transmissions and provides as much protection as Title III.

While the ECPA narrowed the scope of "wire communication" in Title III, the Massachusetts wiretap statute continues to define "wire communication" broadly as *"any communication* made in whole or in part through the use of facilities for the transmission of communications by the *aid of wire, cable, or other like connection* between the point of origin and the point of reception" (emphasis added). G. L. c. 272, § 99 B 1. Given that a text message is a communication transmitted over a cellular network that travels in part by wire or cable or other like connection within a switching station, it seems self-evident that text messages fall within the plain language of the definition of "wire communication" in § 99. Further, where Title III, as amended by the ECPA, broadened the definition of "intercept" to include "the aural or *other acquisition* of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" (emphasis added), 18 U.S.C. §§ 2510(4), the Massachusetts wiretap statute has always defined "interception" broadly as meaning, "to secretly hear [or] *secretly record . . .* the contents of any wire . . . communication through the use of any intercepting device" (emphasis added). G. L. c. 272, § 99 B 2.

Insofar as the Massachusetts wiretap statute does not define

the term "record," we are guided by the legislative imperative that, when interpreting statutes, "[w]ords and phrases shall be construed according to the common and approved usage of the language." G. L. c. 4, § 6, Third. *Commonwealth* v. *Brown*, 431 Mass. 772, 775 (2000) ("When the language of a statute is plain and unambiguous, it must be given its ordinary meaning"). Webster's Third New International Dictionary 1898 (1971) defines "record" to mean, "to set down in writing" or "to cause (sound, visual images) to be transferred to and registered on something [by] electronic means in such a way that the thing so transferred and registered can . . . be subsequently reproduced." Infused by the ordinary meaning of the term "record," it is apparent that the Legislature's use of the phrase "secretly record" includes the interception of text messages by viewing and transcribing them for use at a later date. See *Commissioner of Correction* v. *Superior Court Dep't of the Trial Court for the County of Worcester*, 446 Mass. 123, 124 (2006), quoting *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 853 (1983) ("primary source of insight into the intent of the Legislature is the language of the statute"). Ostensibly, then, the definition of "interception" under the Massachusetts wiretap statute, is as protective as the use of the phrase "other acquisition" in the definition of "interception" under Title III.

In light of the broad statutory definitions of the terms "wire communication" and "interception," we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages consistent with the protections currently provided by Title III and, therefore, is not preempted. Consequently, a Superior Court judge is permitted to issue warrants authorizing the interception of text messages under G. L. c. 272, § 99.

*Conclusion.* The answer to the reported question being, "Yes," as to both cellular telephone calls and text messages, the case is remanded to the Superior Court for further action consistent with this opinion.

*So ordered.*